## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Greenbelt Resources Corporation,
f/k/a Originally New York, Inc.,

                Plaintiff,

vs.

Redwood Consultants, LLC,
U.S. Sustainable Energy Corporation,
and John Rivera, Individually and in
his Capacity as Chairman and Chief
Executive Officer of U.S. Sustainable
Energy Corporation,

                Defendants.

Court File No.:
**Jury Trial Demanded**


**COMPLAINT**

---

For its Complaint against defendants Redwood Consultants, LLC, U.S. Sustainable Energy Corporation and John Rivera, plaintiff Greenbelt Resources Corporation states and alleges as follows:

### INTRODUCTION

1.    This is an action for conversion of property, unjust enrichment, intentional misrepresentation, civil conspiracy, violation of 18 U.S.C. § 1962(c) (the Racketeer Influenced and Corrupt Organizations Act (Civil RICO)) and Civil RICO Conspiracy for which plaintiff seeks judgment against defendants in an amount to be proven at trial, together with its costs and reasonable attorney fees.

### PARTIES

2.    Plaintiff Greenbelt Resources Corporation ("Greenbelt") is a publicly traded Nevada corporation conducting business throughout the United States (including Minnesota) with its principal place of business and corporate

headquarters located at 216 N. Commercial, Eagle Grove, Iowa 50533.  Formerly known as "Originally New York, Inc." ("ONYI"), circa June 2007, pursuant to the written consent of a majority of its shareholders, ONYI changed its name to Greenbelt.  Diversified Ethanol Corporation ("Diversified"), a wholly owned subsidiary of Greenbelt's, manufactures scale size ethanol plants of the type involved in this action.

3.      Defendant Redwood Consultants, LLC ("Redwood") is a California limited liability company conducting business throughout the United States (including Minnesota) with its company headquarters located at 250 Bel Marin Keys Boulevard, Building A-1, Novato, California 94949.  Redwood's registered agent for service of process is also identified as its "Managing Director" Jens Dalsgaard ("Dalsgaard").  Redwood touts itself as "a full-service investor relations firm that works closely with emerging, publicly traded companies to communicate their value to the investment community and build and sustain greater investor sponsorship."  Redwood's "mission is to deliver highly credible information and comprehensive research on the corporate potential of the emerging companies [it] represent[s] to the Wall Street community of analysts, institutional investors and retail stockbrokers."  Redwood, as "Investor Relations Contact," acted in concert with defendants U. S. Sustainable Energy Corporation and John Rivera regarding the tortious scheme involving Greenbelt.

4.      Defendant U. S. Sustainable Energy Corporation ("USSEC") is a publicly traded Nevada corporation conducting business throughout the United

States (including Minnesota) with its corporate headquarters located at 500 Industrial Street, Port Gibson, Mississippi 39150.  USSEC purports to possess a "patent-pending" liquid biofuel that provides clean, renewable energy at a fraction of the cost of traditional biodiesel.  Manufactured utilizing the so-called "Rivera Process" (the alleged result of 18 years of research by CEO and company founder John Rivera) USSEC's biofuel is touted as "highly efficient," allegedly creating "over three times more fuel per feedstock unit than typical biodiesel processes, it also produces a rich, natural ash fertilizer and biogas."  USSEC, as the "corporate front," acted in concert with defendants Redwood and John Rivera regarding the tortious scheme involving Greenbelt.

5.     Defendant John Rivera ("Rivera") is USSEC's Chairman and CEO who conducts business throughout the United States (including Minnesota) on USSEC's behalf.  Upon information and belief, Rivera is a resident of Mississippi.  Rivera is USSEC's founder who claims to have discovered a method ("Rivera Process") for making a unique new biofuel that purports to have all of the benefits of leading fuel sources without any of the traditional problems normally associated therewith.  The Rivera Process purports to produce up to three times more fuel per starting feedstock than any known bioprocess, in turn, making the cost thereof cheaper than either current biodiesel or petroleum diesel, with a higher thermal energy while producing less harmful emissions than other fossil fuels currently in use.  Rivera, as the "front man," acted in concert with

defendants Redwood and USSEC regarding the tortious scheme involving Greenbelt.  The tortious conduct hereafter alleged against Rivera occurred in both his individual capacity and that as USSEC's Chairman and CEO for which, under principles of *respondeat superior* and/or vicarious liability or agency, USSEC is liable for Rivera's tortious conduct.

6.     Unless referred to individually, Redwood, USSEC and/or Rivera are hereinafter collectively referred to as "Defendants."

## JURISDICTION AND VENUE

7.     Greenbelt brings its claims pursuant to, *inter alia*, 18 U.S.C. § 1962(c) (the Racketeer Influenced and Corrupt Organizations Act (Civil RICO)). 28 U.S.C. § 1331 establishes federal question jurisdiction of this Court.  As portions of defendants' tortious scheme were generated through their numerous contacts with Minnesota residents, this Court has personal jurisdiction over defendants and venue is proper herein. Greenbelt further invokes this Court's pendant jurisdiction regarding claims arising under the laws of the State of Minnesota.  Greenbelt's damages exceed $75,000.00, excluding interest, costs and attorney fees.

## FACTS

### Rivera Contacts ONYI.

8.     Circa December 2006 and continuing, in need of an ethanol plant to further Defendants' scheme, Rivera contacted Taylor Moffitt ("Moffitt" (ONYI's

-4-

CEO)), to discuss the purchase of one of Diversified's plants.   As his pitch, Rivera claimed, *inter alia*, that USSEC was a company "attempting to replace foreign oil."  Moffitt dismissed USSEC as an unlikely customer, concluding that USSEC did not appear to be the type of company in the market for one of Diversified's A500 ethanol plants because the 500,000-gallon capacity thereof was far too small for a company attempting to replace foreign oil.

9.      Circumventing Moffitt, Rivera, in turn, contacted certain of Moffitt's colleagues to curry their favor in convincing Moffitt that through USSEC, Rivera was interested in helping Diversified capitalize; to that end, Rivera wanted Moffitt and colleagues to visit USSEC's facility and bring some ethanol for testing. Upon his returning Rivera's call, Moffitt was told that USSEC had a revolutionary new technology (i.e. the Rivera Process) that would put all fuel companies out of business.   Touting his millions of dollars in financial resources, Rivera represented, "that British Petroleum was trying to buy his technology for nine billion dollars."  Rivera said that USSEC needed small ethanol plants to pair with its small reactors.   Thereafter, Diversified supplied two containers of denatured ethanol to USSEC for testing purposes.

**The Visit To USSEC's Mississippi Facility.**

10.      Thereafter, Moffitt and colleague Vint Lewis ("Lewis" (a Minnesota resident)) drove from Iowa to meet with Rivera and visit USSEC's facility in Natchez, Mississippi.  Over breakfast the following morning, Rivera dominated

the conversation, preventing Moffitt from ever discussing Diversified's A500 ethanol plants (then or during the remainder of his visit).   Instead, to curry credibility with Moffitt and Lewis, Rivera emphasized his alleged charitable deeds to orphans, battered women, battered children, battered animals and education while concurrently touting his desire to defeat "The Seven Sisters of Big Oil" while helping farmers and creating jobs.

11.     Rivera then took Moffitt and Lewis to tour a tire recycling facility, where a large gasification unit was running.  The unit operated "batch/continuous" with a steady stream of beans being augered into the front of the machine and, in turn, a steady stream of burnt soybeans coming out of the other end, which Rivera represented was his "$15.00 per pound organic fertilizer."

12.     During his tour, Rivera represented that the U.S. Air Force was running his fuel in their jets because of its low freezing temperature and that he had documentation showing that the U.S. Air Force must, by law, buy electricity from him.  Rivera further represented that his fuel would be burned in turbine generators to produce green electricity that must be purchased by government agencies.

13.     Rivera then provided Moffitt and Lewis a demonstration; running engines and having them touch the engines to demonstrate how cool they were running while claiming, for example, that when Rivera got this million-mile engine, it barely ran.  Rivera also claimed that he/USSEC was hated by the automakers

because in the future, when his/USSEC's fuel has replaced big oil, engines will last forever.

14.    Rivera went on to claim that his life was in danger due to such technology and that attempts had been made on his life; hence, his need for having armed guards.

15.    Rivera had additional demonstrations performed utilizing the ethanol samples mixed with his biofuel.  During the same, Rivera went on to tell Moffitt and Lewis, "by selling his organic fertilizer at $15.00 per pound, and getting the Kyoto Treaty Green Certificates, and the carbon credits, and the ethanol credits, he would be able to give away his biofuel for free and still make money, even if soybeans went up to $20 per bushel."

16.    Rivera claimed that USSEC would put an end to dependence on foreign oil.  That he would be able to pay farmers 10% more for their beans and would be making billions every year from which he would be able to buy-out the competition after they had gone bankrupt and, in turn, dominate the whole industry.

17.    Rivera then had his colleague Kelmer Smith ("Smith") later provide Moffitt and Lewis with a tour of USSEC's Natchez plant during which they were told that everything in sight was owned, "debt-free."

18.    Upon meeting back up with Rivera, Rivera displayed his rare exotic sports car touted as "a gift from Redwood" while claiming, "Redwood's so glad to

have my business that they gave me that and a $150,000 platinum Rolex."
Pointing across the Mississippi River to Vadalia, Louisiana, Rivera told Moffitt
and Lewis, "we also own 150 acres of land across the Mississippi for expansion."
While standing on the dock, Rivera said that he hired the best patent law firm in
the U.S. with a $100,000 retainer fee and that it was super-excited about his
technology now that they have seen it.  Rivera also claimed this was the same
firm that patents all of British Petroleum's technology.

19.     Upon returning to the office, in furtherance of Defendants' scheme,
Rivera started asking Moffitt detailed questions about ONYI stock.

### USSEC Decides To "Buy-Out" ONYI.

20.     Later that day, Moffit and Lewis were driven to Rivera's estate replete
with high wooden fences and guard dogs imported from Germany.   During their
visit, Rivera stated, "he had less than two years to live, that British Petroleum
had offered to pay nine billion dollars for his technology and that he turned them
down because he did not want them to snuff out his technology to prolong the
foothold of big oil."   Rivera also stated, "Cargill offered to pay him the same nine
billion dollars, but he turned them down because they are French and he is too
patriotic and, as a former Marine, wanted to keep this for America."

21.     That evening over dinner, Rivera began telling Moffitt and Lewis how
he had taken over Turnkey Electric and other companies.   Dominating the
conversation, Rivera again inquired about ONYI stock culminating with his

stating, "he wanted to buy-out ONYI, resulting in all ONYI stock being converted into USSEC."   After finishing dinner, Moffitt and Lewis returned to Iowa very pleased with the meeting, concluding that at a minimum, Rivera/USSEC would be purchasing some of Diversified's ethanol plants.

### USSEC's Plan To Buy-Out ONYI Results In A "Memorandum Of Understanding."

22.    Upon returning to Iowa, Moffitt was surprised to learn that rumors were already circulating that USSEC had taken over ONYI.

23.    The next day, Rivera called Moffitt and said he was going to fly up to Iowa to inspect ONYI's facilities before he acquired it.

24.    On December 21, 2006, in furtherance of Defendants' scheme, Rivera and colleagues flew to ONYI's headquarters in Iowa (on a charted plane arranged for by Redwood); however, due to inclement weather, they were forced to land in Omaha, Nebraska, and then drove 3 hours in a rental car the rest of the way to ONYI's headquarters.

25.    Upon arriving, Rivera and colleagues met with Moffit and colleagues to discuss a merger of USSEC with ONYI resulting in one "super company." Following a presentation (with representations identical to those previously made to Moffitt and Lewis), Rivera drew a diagram stating, "The 'super company' would be USSEC under which would be Turnkey Electric, Diversified Ethanol, PESCO, Sustainable Power, the fertilizer company, and some other companies totaling

seven in number." Rivera said that ONYI would, in turn, end up owning a portion of all of these companies as they grew and that the share price of ONYI stock would skyrocket.

26.    Following the meeting, Rivera and party were provided a tour of ONYI's facility and ethanol plant (which was 95% complete at the time). During the tour Rivera appeared uninterested; instead he continued discussing/inquiring about ONYI's stock. Following the tour, Rivera proposed a merger of the companies while claiming that Diversified was going to build all of USSEC's ethanol plants and, eventually, the largest ethanol plant in the world.

27.    Thereafter, discussions between Moffitt and colleagues ensued regarding the value of the merger, USSEC's technology, how ONYI and Diversified could save money by working with USSEC, and what it would mean to ONYI's shareholders if USSEC provided ONYI with the proposed funding. The group agreed to move forward.

28.    On December 22, 2006, in furtherance of Defendants' scheme, Redwood's Dalsgaard contacted Lewis to discuss the status of matters and later confirmed the same and provided Lewis with his contact information.

29.    On December 22, 2006, the parties met again during which Smith presented a laptop computer containing a pre-prepared "Memorandum Of Understanding" ("MOU") between USSEC and ONYI. Following some updates, Rivera and Moffitt signed the document.

30.     The MOU provided, *inter alia*, that its "purpose" was to continue to develop and expand a framework of cooperation between USSEC and ONYI. That ONYI would acquire certain assets of USSEC in an acquisition through stock for asset swap and that the surviving company would be a single entity specializing in the production of organic fertilizer, carbon, liquid and gaseous biofuels, ethanol and green power.  In reality, Rivera/USSEC's obtaining the MOU was a critical step in furtherance of Defendants' scheme and, thereby, allowed Defendants to obtain confidential, financial and/or otherwise proprietary information regarding ONYI.

31.     The MOU also contained a "statement of mutual benefit and interests" the next effect of which was that the original ONYI shareholders would own 10% of the new company and the original USSEC shareholders would own 90% of the new company.  USSEC would be the parent holding company of multiple wholly subsidiaries that would be spun off into separate public companies at a later date.

32.     After signing the MOU, Rivera instructed Moffitt to check in with Rivera and Smith every morning.  Rivera also told Moffitt that Smith would act as liaison and that Moffit would be given a USSEC email address with which to communicate.  Rivera also stated that he would be sending his accountant to Iowa to obtain ONYI's financial records. Before leaving, Rivera pointed at a small working model of an ethanol "still" and said, "I want that.  Send it down to me for

my Christmas present."  Another was ordered and sent to him within the week.

33.    On December 28, 2006, in furtherance of Defendants' scheme, Rivera sent Lewis a spreadsheet that Rivera had prepared which included a "Financial Results Summary" representing millions of dollars of profits that would be made.

### The MOU Results In Press Releases.

34.    On January 4, 2007, in furtherance of Defendants' scheme, Redwood's Dalsgaard circulated a draft of a press release to Lewis and Rivera stating, "Diversified Ethanol A Division of Originally New York, Inc. Closing In On $12 Billion Acquisition To Become Market Leader In Ethanol Production – Combined Companies To Produce Ethanol At 60% Discounts To Any Other Technology In The World."  The release went on to state, "In light of these facts, *if our combined companies were to eventually have a billion shares outstanding, the intrinsic value of our company stock  would be  $12 per share*, other growth catalysts not considered."  (Emphasis).

35.    On January 5, 2007, in furtherance of Defendants' scheme, Redwood's Dalsgaard also circulated a draft of a press release ("1/5//07 Press Release") to be issued by USSEC entitled "U.S. Sustainable Energy Corp. And Diversified Ethanol, Inc. Sign Memorandum Of Understanding To Join Forces To Enter Multi Billion Dollar Ethanol Market."   The 1/5/07 Press Release identified Redwood as the "Investor Contact."

-12-

### ONYI Changes Its Name To United Ethanol Group, Inc.

36.    On February 2, 2007, in furtherance of Defendants' scheme and at Rivera/USSEC's insistence, ONYI, the parent company of Diversified announced that it was changing its name to United Ethanol Group, Inc. ("United Ethanol"). Concurrently, consistent with the MOU, ONYI/United Ethanol named Rivera Chairman of the Board of Directors.   In reality, Rivera/USSEC's insisting that ONYI change its name to United Ethanol was a critical additional step in furtherance of Defendants' scheme.

### United Ethanol And USSEC Sign A "Definitive Agreement."

37.    On February 27 and March 2, 2007, respectively, following ONYI's changing its name to United Ethanol and Rivera's being appointed as Chairman and in furtherance of Defendants' scheme, United Ethanol and USSEC signed a "Technology Licensing And Acquisition Agreement" ("Definitive Agreement" (with an effective date of February 21, 2007)).   The Definitive Agreement detailed, *inter alia*, the conditions needed to move towards completing the previously announced MOU outlining the planned merger and corporate restructure under the terms of which, USSEC would be merged into ONYI and become a full reporting company trading on the bulletin boards; the surviving entity to be renamed USSEC.  In reality, Rivera/USSEC's obtaining the Definitive Agreement was a critical additional step in furtherance of Defendants' scheme and, thereby, allowed Defendants to exercise *de facto* control over ONYI.

-13-

**Rivera/USSEC Have Diversified's Ethanol Plant Moved From Iowa To Mississippi.**

38.     Following execution of the Definitive Agreement, at the insistence of now Chairman Rivera, Diversified's $800,000.00 A70 ethanol plant was disassembled and moved from its Iowa location to USSEC's facility in Mississippi.

**With Diversified's Ethanol Plant Now In Mississippi, USSEC Terminates The Definitive Agreement.**

39.     On March 29, 2007, in furtherance of Defendants' scheme and after having absconded with Diversified's ethanol plant to Mississippi, USSEC had its attorney notify ONYI that the Definitive Agreement was "terminated *ab initio*" (i.e. from its inception).

**Rivera And Smith "Resign" From ONYI.**

40.     On March 29, in furtherance of Defendants' scheme and concurrent with its termination of the Definitive Agreement, Rivera resigned as Chairman of ONYI's Board and Smith resigned as a Director of ONYI.

**USSEC Rebukes ONYI's Attempts To Obtain The Return Of ONYI's Property.**

41.     On April 12, 2007, ONYI had its attorney send a letter to USSEC demanding that it return all of ONYI's property, including, without limitation, its A70 ethanol plant (now located in Mississippi (or pay ONYI $800,000 for it), ONYI's corporate and financial records, etc.  USSEC refused to do so.

-14-

**The SEC Investigates "USSEC."**

42.     On July 2, 2007, the U.S. Securities and Exchange Commission ("Commission"), pursuant to Litigation Release Number 20182, filed an application with the United States District Court for the Northern District of Georgia for an order to enforce investigative subpoenas served on a privately held corporation located in Seffner, Florida also named U.S. Sustainable Energy Corporation ("USSEC-FL") and its President John Stanton ("Stanton") a resident of Tampa, Florida.  The Commission's application and supporting papers allege that USSEC-FL and Stanton have failed to comply with validly issued and served subpoenas for documents relating to the Commission's investigation. Importantly, the Commission's investigation "involves, but is not limited to, *a separate but related corporation known as [USSEC], which is headquartered in Mississippi . . .*"  (Emphasis).

**Rivera Has USSEC's Smith Arrested.**

43.     Sometime thereafter, in furtherance of Defendants' scheme, based upon fabricated allegations of wrongdoing, Rivera had Smith arrested for purportedly "embezzling" trade secrets.

**Rivera Has USSEC's Accountant Arrested.**

44.     Sometime thereafter, in furtherance of Defendants' scheme, based upon fabricated allegations of wrongdoing, Rivera also had USSEC's longtime certified public account Lisa Kerr arrested for purportedly "impersonating a

-15-

certified public accountant."

**The Consequences of Defendants' Scheme.**

45.     As a direct and proximate result of Defendants' scheme, ONYI has, without limitation, been left deeply in debt, was forced to "de-list" from the over-the-counter ("OTC") stock market (and, thereby, relegated to the pink sheets), has incurred substantial diminution in the value of its stock and has had its property illegally converted.   Greenbelt's claims follow:

<u>**COUNT ONE**</u>

**CONVERSION OF PROPERTY**

46.     Greenbelt restates and realleges the foregoing paragraphs 1-45 as against USSEC and Rivera as though fully set forth herein.

47.     ONYI has at all times maintained and asserted a property interest in its property including, without limitation, its $800,000.00 A70 ethanol plant, ONYI's corporate and financial records, etc.

48.     That prior to and/or following USSEC's termination of the Definitive Agreement *ab initio* (i.e. from its inception), certain of Greenbelt's property (including, without limitation, its $800,000.00 A70 ethanol plant, ONYI's corporate and financial records, etc.) was taken by USSEC and Rivera.

49.     Following USSEC's termination of the Definitive Agreement *ab initio* (i.e. from its inception), ONYI duly demanded the return of its property and/or payment for its $800,000.00 A70 ethanol plant.   USSEC refused to do so.

50.     Following USSEC's taking of ONYI's property, USSEC and Rivera failed to return and/or pay for the same and, instead, have converted the same for USSEC and/or Rivera's own use.

51.     USSEC and/or Rivera's retention of ONYI's property without returning and/or paying for the same has proximately caused Greenbelt damages in an amount in excess of $800,000.00 and, additionally, requires USSEC and/or Rivera to provide a detailed accounting thereof.

## COUNT TWO

### UNJUST ENRICHMENT

52.     Greenbelt restates and realleges the foregoing paragraphs 1-51 as against USSEC and Rivera as though fully set forth herein.

53.     USSEC and Rivera have received property from ONYI with the expectation and understanding that USSEC would pay for such property. However, USSEC has failed and refuses to pay for the same.

54.     As a result, USSEC and/or Rivera have been unjustly enriched in an amount in excess of $800,000.00.

## COUNT THREE

### INTENTIONAL MISREPRESENTATION

55.     Greenbelt restates and realleges the foregoing paragraphs 1-54 as against all Defendants as though fully set forth herein.

56.     As described in paragraphs 8-45, Defendants made representations

to ONYI through spreadsheets containing a "Financial Results Summary" representing that millions of dollars of profits that would be made, through repeated statements that "British Petroleum had offered to pay nine billion dollars for [Rivera's] technology, and that [he had] turned them down because he did not want them to snuff out his technology to prolong the foothold of big oil," and through representations that by combining the resources of ONYI and USSEC in the context of the "$12 Billion Acquisition To Become Market Leader In Ethanol Production . . . *the intrinsic value of [the] company stock would be $12 per share*, other growth catalysts not considered."

57.    Defendants' foregoing representations and conduct consistent therewith were at all times material to ONYI's decision to enter into the MOU, the Definitive Agreement and/or allow its property to be provided to USSEC.

58.    At the time of making such representations, Defendants knew that the same were false.  With such knowledge, Defendants intended that their representations would be relied upon by ONYI.  Defendants intended to benefit from ONYI's reliance by obtaining, *inter alia*, certain of ONYI's property (including, without limitation, its $800,000.00 A70 ethanol plant) and corporate and financial records, etc.

59.    To its detriment and lacking knowledge of Defendants' true intentions, ONYI relied upon Defendants' representations and entered into the MOU, the Definitive Agreement and/or allowed its property to be provided to

-18-

USSEC.   Shortly thereafter, with ONYI's property in their possession, Defendants terminated the Definitive Agreement *ab initio* (i.e. from its inception) concurrent with Rivera and Smith resigning from ONYI.

60.    Defendants' misrepresentations have proximately caused Greenbelt damages in an amount in excess of $800,000.00 regarding its property.

61.    Defendants' misrepresentations have proximately caused substantial diminution in the value of Greenbelt's stock resulting in damages in an amount in excess of $75,000.00.

## COUNT FOUR

### CIVIL CONSPIRACY

62.    Greenbelt restates and realleges the foregoing paragraphs 1-61 as against all Defendants as though fully set forth herein.

63.    Beginning circa December 2006 and continuing, Defendants willfully and unlawfully conspired, combined and agreed with each other to commit certain tortious acts.   Specifically, Defendants each knowingly, willfully and unlawfully agreed to make and did make fraudulent misrepresentations concerning the nature of their transactions with ONYI.

### Object And Means Of The Conspiracy

64.    It was the object of the aforementioned conspiracy that Defendants would and did defraud ONYI to obtain certain of ONYI's property (including, without limitation, its $800,000.00 A70 ethanol plant) and corporate and financial

records, etc. by means of false and fraudulent pretenses, representations and promises.

65.     In furtherance of the aforementioned conspiracy, without limitation, the following manner and means were accomplished:

(a)     Defendants did agree, together and with each other, that they provide complimentary/reciprocal verbal misrepresentations to ONYI calculated to curry credibility with ONYI for the purpose of its engaging in prospective business activities with Defendants.

(b)     Defendants did agree, together and with each other, that they would thereafter supplement such verbal misrepresentations with sham spreadsheets and/or press releases to bolster the veracity thereof and, in turn, curry credibility with ONYI to that it would enter into the MOU, the Definitive Agreement and/or otherwise provide ONYI's property to Defendants

### Overt Acts

66.     To execute, accomplish and carry out the aforementioned conspiracy, Defendants performed, without limitation, the following overt acts:

(a)     Defendants prepared sham spreadsheets containing a "Financial Results Summary" representing that millions of dollars of profits that would be made.

(b)     Defendants repeatedly stated "British Petroleum had offered to pay nine billion dollars for [Rivera's] technology, and that [he had] turned them down because he did not want them to snuff out his technology to prolong the foothold of big oil."

(c)     Defendants issued press releases representing ONYI would be a participant in a "$12 Billion Acquisition To Become Market Leader In Ethanol Production . . . *the intrinsic value of [the] company stock would be $12 per share*, other growth catalysts not considered."

(d)     Defendants issued a sham MOU and Definitive Agreement, the latter of which was later terminated *ab initio* (i.e. from its inception) following Defendants acquiring ONYI's property.

67.     As a proximate result of the aforementioned conspiracy, Greenbelt has been damaged in an amount in excess of $75,000.00.

## COUNT FIVE

### VIOLATION OF 18 U.S.C. § 1962(c)

### THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT

68.     Greenbelt restates and realleges the foregoing paragraphs 1-67 as against all Defendants as though fully set forth herein.

69.     At all times relevant, Redwood and USSEC were enterprises operating in interstate commerce.

70.     From prior to December 2006 and continuing Defendants worked together to, *inter alia*, raise capital investment through the promotion and/or sale of stock in USSEC and/or its technologies including, without limitation, the so-called Rivera Process.  Redwood, USSEC and Rivera had a common purpose separate and distinct from their racketeering activity and a continuity of structure.

71.     Redwood participated in the enterprise's affairs by, without limitation, acting as USSEC's "Investor Relations Contact," responding to inquiries from potential investors, and preparing and/or assisting in the preparation of press releases involving USSEC and/or Rivera's business activities.

72.     USSEC participated in the enterprise's affairs by, without limitation,

distributing materials to Redwood for distribution to potential investors, providing demonstrations to the public such as its December 10, 2006 video captioned "Global Validation Presentation" (during which Redwood's Dalsgaard is identified as being in attendance) and preparing and/or assisting in the preparation of press releases involving USSEC and/or Rivera's business activities.

73.     Rivera participated in the enterprise's affairs by, without limitation, distributing materials to Redwood for distribution to potential investors, providing demonstrations to the public such as its December 10, 2006 video captioned "Global Validation Presentation" and preparing and/or assisting in the preparation of press releases involving USSEC and/or Redwood's business activities.

74.     All parties contributed to the development and promotion of activities precipitating Defendants' business dealings with ONYI by attending meetings with ONYI's personnel, regularly telephoning and/or e-mailing ONYI's personnel regarding the status of events, visiting ONYI's facility, etc.

75.     Defendants conducted and participated in the affairs of one another and associated themselves through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

76.     Beginning sometime prior to December 2006 and continuing, Defendants combined and joined together, forming an enterprise affecting interstate commerce and associating themselves with such enterprise for the common purpose of perpetrating schemes and artifices to defraud ONYI and to

convert its property by means of false and fraudulent pretenses, representations and promises through a pattern of racketeering in violation of 18 U.S.C. § 1962(c). In particular, Defendants defrauded ONYI out of an ethanol plant and diminished the value of its stock resulting in damages in excess of millions of dollars.

77.     For the purpose of executing this scheme and artifice to defraud ONYI, Defendants did on numerous occasions send, or caused to be sent, emails and facsimiles over the telecommunications wires, for delivery via such wires, and did receive emails and facsimiles sent over the telecommunications wires, all in violation of 18 U.S.C. § 1341.

78.     Specifically, Defendants sent, or caused to be sent, over telecommunications wires, emails, and facsimiles containing false statements about the nature of their transactions, all of which were used to further Defendants' fraudulent scheme of misrepresenting the nature of their transactions to combine resources with ONYI resulting in a merger and corporate restructure under the terms of which, USSEC would be merged into ONYI and become a full reporting company trading on the bulletin boards; the surviving entity to be renamed USSEC. Such telecommunications included, without limitation:

> (a)     The January 4, 2007 press release stating, "Diversified Ethanol A Division of Originally New York, Inc. Closing In On $12 Billion Acquisition To Become Market Leader In Ethanol Production – Combined Companies To Produce Ethanol At 60% Discounts To Any Other Technology In The World." The

release went on to state, "In light of these facts, *if our combined companies were to eventually have a billion shares outstanding, the intrinsic value of our company stock would be $12 per share*, other growth catalysts not considered." (Emphasis).

(b)    The January 5, 2007 press release entitled "U.S. Sustainable Energy Corp. And Diversified Ethanol, Inc. Sign Memorandum Of Understanding To Join Forces To Enter Multi Billion Dollar Ethanol Market."

Additionally, Defendants obtained funds from ONYI via wire transfer from ONYI's bank account.

79.    Defendants' racketeering activity had a pattern insofar as they engaged in the foregoing conduct on numerous individual occasions.

80.    Defendants' racketeering activity had a pattern insofar as they, on separate occasions, created and presented the MOU, various press releases and the Definitive Agreement to ONYI.

81.    Defendants fraudulently concealed their scheme to defraud ONYI by specifically presenting the Definitive Agreement to create the appearance that the events contemplated therein would occur, all the time knowing that upon the execution thereof that ONYI's property would be acquired and immediately thereafter the Definitive Agreement would be terminated *ab initio* (i.e. from its inception).

82.    In reliance upon the false and fraudulent representations made by Defendants, ONYI transferred certain of its property (including, without limitation,

-24-

its $800,000.00 A70 ethanol plant) and corporate and financial records, etc. to USSEC.

83.     Defendants participation in a pattern of racketeering in connection with their respective businesses, which are engaged in interstate commerce, constitutes a violation of 18 U.S.C. § 1962(c).

84.     Defendants' violation of 18 U.S.C. § 1962(c) has proximately caused Greenbelt damages in an amount in excess of $75,000.00.

## COUNT SIX

### CIVIL RICO CONSPIRACY

85.     Greenbelt restates and realleges paragraphs 1-84 as against all Defendants as though fully set forth herein.

86.     Beginning circa December 2006 and continuing, Defendants willfully and unlawfully conspired, combined and agreed with each other to commit certain tortious acts.  Specifically, Defendants each knowingly, willfully and unlawfully agreed to make and did make fraudulent misrepresentations concerning the nature of their transactions with ONYI.

### Object And Means Of The Conspiracy

87.     It was the object of the aforementioned conspiracy that Defendants would and did defraud ONYI to obtain certain of ONYI's property (including, without limitation, its $800,000.00 A70 ethanol plant) and corporate and financial

-25-

records, etc. by means of false and fraudulent pretenses, representations and promises.

88.    In furtherance of the aforementioned conspiracy, without limitation, the following manner and means were accomplished:

      (c)    Defendants did agree, together and with each other, that they provide complimentary/reciprocal verbal misrepresentations to ONYI calculated to curry credibility with ONYI for the purpose of its engaging in prospective business activities with Defendants.

      (d)    Defendants did agree, together and with each other, that they would thereafter supplement such verbal misrepresentations with sham spreadsheets and/or press releases to bolster the veracity thereof and, in turn, curry credibility with ONYI to that it would enter into the MOU, the Definitive Agreement and/or otherwise provide ONYI's property to Defendants

## Overt Acts

89.    To execute, accomplish and carry out the aforementioned conspiracy, Defendants performed, without limitation, the following overt acts utilizing U.S. Mail, email and facsimile via the telecommunications wires:

      (e)    Defendants prepared sham spreadsheets containing a "Financial Results Summary" representing that millions of dollars of profits that would be made.

      (f)    Defendants repeatedly stated "British Petroleum had offered to pay nine billion dollars for [Rivera's] technology, and that [he had] turned them down because he did not want them to snuff out his technology to prolong the foothold of big oil."

      (g)    Defendants issued press releases representing ONYI would be a participant in a "$12 Billion Acquisition To Become Market Leader In Ethanol Production . . . *the intrinsic value of*

*[the] company stock would be $12 per share*, other growth catalysts not considered."

(h)     Defendants issued a sham MOU and Definitive Agreement, the latter of which was later terminated *ab initio* (i.e. from its inception) following Defendants acquiring ONYI's property.

90.     As a proximate result of the aforementioned conspiracy, Greenbelt has been damaged in an amount in excess of $75,000.00.

## JURY DEMAND

Greenbelt respectfully demands trial by jury of all claims and issues so triable as allowed pursuant to applicable law.

WHEREFORE, plaintiff Greenbelt Resources Corporation prays for judgment against defendants as follows:

1.     As to Count One of Greenbelt's Complaint (Conversion of Property), a money judgment against USSEC and Rivera for damages in an amount in excess of eight hundred thousand ($800,000.00) dollars;

2.     As to Count Two of Greenbelt's Complaint (Unjust Enrichment), a money judgment against USSEC and Rivera for damages in an amount in excess of eight hundred thousand ($800,000.00) dollars;

3.     As to Count Three of Greenbelt's Complaint (Intentional Misrepresentation), a money judgment against Defendants for damages in an amount in excess of eight hundred and seventy-five thousand ($875,000.00) dollars;

-27-

4.     As to Count Four of Greenbelt's Complaint (Civil Conspiracy), a money judgment against Defendants for damages in an amount in excess of seventy-five thousand ($75,000.00) dollars;

5.     As to Count Five of Greenbelt's Complaint (RICO), a money judgment against Defendants for damages in an amount in excess of seventy-five thousand ($75,000.00) dollars;

6.     As to Count Six of Greenbelt's Complaint (Civil RICO Conspiracy), a money judgment against Defendants for damages in an amount in excess of seventy-five thousand ($75,000.00) dollars;

7.     Greenbelt's costs, disbursements, reasonable attorney fees and prejudgment interest; and

8.     For such other and further relief as this court may deem just and equitable.

GARDNER LAW OFFICE

Dated: September 26, 2007          *s/ Robert M. Gardner*_____
                                   Robert M. Gardner, #234977
                                   P.O. Box 22071
                                   St. Paul, MN 55122-0071
                                   (651) 681-8339

                                   Attorney for Plaintiff
                                   Greenbelt Resources Corporation

-28-