## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Greenbelt Resources Corporation,                Court File No.: 07-CV-4103 DWF/SRN
f/k/a Originally New York, Inc.,                 **Jury Trial Demanded**

                  Plaintiff,

vs.                                              **AMENDED COMPLAINT**

Redwood Consultants, LLC,
U.S. Sustainable Energy Corporation,
and John Rivera, Individually and in
his Capacity as Chairman and Chief
Executive Officer of U.S. Sustainable
Energy Corporation,

                  Defendants.

For its Amended Complaint, plaintiff Greenbelt Resources Corporation states and alleges as follows:

### INTRODUCTION

1.       This is an action for conversion of property, unjust enrichment, intentional misrepresentation and civil conspiracy for which plaintiff seeks judgment against defendants in an amount to be proven at trial, together with its costs and reasonable attorney fees.

### PARTIES

2.       Plaintiff Greenbelt Resources Corporation ("Greenbelt") is a publicly traded Nevada corporation conducting business throughout the United States (including Minnesota) with its principal place of business and corporate headquarters now located at 1601 Southcross Drive West, Burnsville, Minnesota 55306.  *See* ECF Doc. 3 (Rule 7.1 Amended Corporate Disclosure Statement).

-1-

Formerly known as "Originally New York, Inc." ("ONYI"), circa June 2007, pursuant to the written consent of a majority of its shareholders, ONYI changed its name to Greenbelt.  Diversified Ethanol Corporation ("Diversified"), a wholly owned subsidiary of Greenbelt's, manufactures scale size ethanol plants of the type involved in this action.

3.     Defendant Redwood Consultants, LLC ("Redwood") is a California limited liability company conducting business throughout the United States (including Minnesota) with its company headquarters located at 250 Bel Marin Keys Boulevard, Building A-1, Novato, California 94949.  Redwood's registered agent for service of process is also identified as its "Managing Director" Jens Dalsgaard ("Dalsgaard").  Redwood touts itself as "a full-service investor relations firm that works closely with emerging, publicly traded companies to communicate their value to the investment community and build and sustain greater investor sponsorship."  Redwood's "mission is to deliver highly credible information and comprehensive research on the corporate potential of the emerging companies [it] represent[s] to the Wall Street community of analysts, institutional investors and retail stockbrokers."  Redwood, as "Investor Relations Contact," acted in concert with defendants U. S. Sustainable Energy Corporation and John Rivera regarding the tortious scheme involving Greenbelt.

4.     Defendant U. S. Sustainable Energy Corporation ("USSEC") is a publicly traded Nevada corporation conducting business throughout the United

States (including Minnesota) with its corporate headquarters located at 500 Industrial Street, Port Gibson, Mississippi 39150.  USSEC purports to possess a "patent-pending" liquid biofuel that provides clean, renewable energy at a fraction of the cost of traditional biodiesel.  Manufactured utilizing the so-called "Rivera Process" (the alleged result of 18 years of research by CEO and company founder John Rivera) USSEC's biofuel is touted as "highly efficient," allegedly creating "over three times more fuel per feedstock unit than typical biodiesel processes, it also produces a rich, natural ash fertilizer and biogas."  USSEC, as the "corporate front," acted in concert with defendants Redwood and John Rivera regarding the tortious scheme involving Greenbelt.  Upon information and belief, following the commencement of this action on September 27, 2007, various "press releases" represent that USSEC has since relocated its operations (i.e. production facility) from Mississippi to Texas. Greenbelt alleges that such relocation is not "coincidental" but rather, is a direct result of USSEC and/or Rivera's fleeing numerous creditors in Mississippi and/or in furtherance of defendants' scheme due to the nature thereof involving another USSEC/John Rivera entity/subsidiary named Sustainable Power Corporation ("SSTP") on behalf of which Redwood acts as "investor relations contact" and on which John Rivera sits as Chairman of the Board.  USSEC also purports to pay its shareholder dividends with shares of SSTP stock.

5.     Defendant John Rivera ("Rivera") is USSEC's Chairman and CEO

who conducts business throughout the United States (including Minnesota) on USSEC's behalf.  Rivera is USSEC's founder who claims to have discovered a method ("*Rivera Process*") for making a unique new biofuel that purports to have all of the benefits of leading fuel sources without any of the traditional problems normally associated therewith.  The *Rivera Process* purports to produce up to three times more fuel per starting feedstock than any known bioprocess, in turn, making the cost thereof cheaper than either current biodiesel or petroleum diesel, with a higher thermal energy while producing less harmful emissions than other fossil fuels currently in use.  Rivera, as the "front man," acted in concert with defendants Redwood and USSEC regarding the tortious scheme involving Greenbelt.  The tortious conduct hereafter alleged against Rivera occurred in both his individual capacity and that as USSEC's Chairman and CEO for which, under principles of *respondeat superior* and/or vicarious liability or agency, USSEC is liable for Rivera's tortious conduct.  Upon information and belief, following the commencement of this action on September 27, 2007, Rivera has moved and/or is in the process of moving from Mississippi to Texas.  Greenbelt alleges that such relocation is not "coincidental" but rather, is a direct result of USSEC and/or Rivera's fleeing numerous creditors in Mississippi and/or in furtherance of defendants' scheme due to the nature thereof involving SSTP, another USSEC/Rivera entity/subsidiary on behalf of which Redwood acts as "investor relations contact," Rivera sits as Chairman of the Board and with whose stock

-4-

USSEC purports to pay its dividends.

6.     Unless referred to individually, Redwood, USSEC and/or Rivera are hereinafter collectively referred to as "Defendants."

<u>**SUMMARY**</u>

7.     This case involves a scheme in which Redwood, USSEC and Rivera acted in concert to defraud Greenbelt and/or otherwise convert its property, and/or to defraud an as yet undetermined number of investors and/or shareholders in Greenbelt, USSEC and/or SSTP.  Redwood, USSEC and Rivera orchestrated the scheme with the assistance of Dalsgaard and other, as yet undetermined, individuals and/or entities.

8.     From circa September 24, 2006 and continuing, Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails and/or telecommunications wires in connection with the transactions described in this Amended Complaint to issue numerous false and misleading "press releases" ("*Press Releases*") authored by,  without limitation, Dalsgaard and/or Rivera touting "big money" deals that never materialize(d) and from which to promote and/or distribute false and misleading financial information including, without limitation: "definitive agreements," "joint venture agreements," "memorandums of understanding," merger proposals, reports, "share exchange agreements," "technology licensing and acquisition agreements" and/or other written documents to the public.  The foregoing both

materially overstate(d) the value of USSEC and/or its principal asset, namely the *Rivera Process*, and present(ed) USSEC as a promising biofuel technology company possessing exclusive rights thereto with the potential for substantial earnings when, upon belief, USSEC has never developed a commercially marketable product and generated only *de minimus* (if any) actual revenue.

9.    Defendants' purpose in issuing such sham *Press Releases* and in promoting/distributing such sham financial information was to mislead investors regarding the actual earnings potential of USSEC (i.e. "pumping") and, in turn, induce investors to purchase shares of stock therein and/or engage in transactions therewith.  In reliance thereon, such parties purchased shares of USSEC stock and/or engaged in business transactions therewith as a direct and proximate cause of which such parties suffered damages directly attributable to defendants' conduct.

10.    Defendants have profited from the scheme by, *inter alia*, later selling (i.e. "dumping") shares of USSEC stock at an artificially inflated price and/or by converting and/or retaining the assets and/or other property of individuals and/or entities with which USSEC engaged in various transactions (but which USSEC reneged upon).

11.    By this action, Greenbelt seeks: money damages; injunctive relief as may be allowed; officer and director bars against Rivera; and disgorgement against Rivera.

## JURISDICTION AND VENUE

12.     As portions of Defendants' tortious scheme were generated through their business transactions in Minnesota and/or contacts with residents thereof, Greenbelt brings its claims herein pursuant to the parties' diversity of citizenship and Minnesota's long-arm statute.  28 U.S.C. § 1332; Minn. Stat. § 543.19.

13.     Defendants have, directly and indirectly, made use of the means or instrumentalities of interstate commerce and/or the mails and/or telecommunications wires in connection with their various business transactions in Minnesota and/or contacts with residents thereof as described herein.

14.     As a substantial part of the events or omissions giving rise to Greenbelt's claims occurred in Minnesota, venue is proper herein. 28 U.S.C. § 1391(2),(3).  Greenbelt further invokes this Court's pendant jurisdiction regarding claims arising under the laws of the State of Minnesota.   Greenbelt's damages exceed $75,000.00, excluding interest, costs and attorney fees.

## FACTS

### Rivera's Pattern Of Involvement In Energy-Related Schemes.

15.     Since circa 1988 and continuing, either individually and/or in the capacity as an officer and/or director of an entity involved therewith, Rivera has been involved in various business transactions involving the sale of energy-related products.

16.     Certain of the foregoing business transactions resulted in litigation

against Rivera, individually, and/or the entities with which he acted in the capacity as an officer and/or director therewith. *See e.g. Torco Oil Company v. Innovative Thermal Corporation*, 763 F.Supp. 1445 (N.D. Ill. 1991) (claims regarding transaction involving alleged "cogeneration" of electricity from gas turbine aircraft engines resulting in judgment of $2,554,110.00 against Innovative Thermal Corporation (of which Rivera was president and 50 percent stockholder ("The jury believed Torco, as it was entitled to do; *Rivera was not a credible witness*.")). (Emphasis added). *Id.* at 1449. (*quoting* The Hon. Richard A. Posner, U.S. Circuit Court Judge (sitting by designation)).

### Redwood's Investor Relations-Related Contacts With Minnesota.

17.    Redwood purports that its "only business conducted in Minnesota was performing investor relations services for a small Minneapolis-based client called HyperTension Diagnostics for 12 months in 2001"; however, an August 30, 2006 "Genetic Engineering & Biotechnology News" ("GEN") market wire press release confirms otherwise, stating, Bloomington, Minnesota-based "GelStat Corporation Retain[ed] Redwood Consultants, LLC" to provide strategic communications and planning services, and to assist the Company with its investor relations and business development activities and lists Dalsgaard and Redwood as a "Contact."

18.    That pursuant to records maintained by the Minnesota Secretary of

-8-

State, GelStat is a Minnesota-based "domestic corporation."

19.     That a visit to GelStat Corporation's website ("www.gelstat.com")
also confirms that its respective: November 21, 2006, February 6, 2007, February
13, 2007, March 7, 2007, May 2, 2007, June 19, 2007, July 18, 2007 and
September 5, 2007 press releases ("*GelStat Press Releases*"), and GelStat's
website's "About GelStat Corporation" ALL list Redwood as its investment
relations contact; hence, it is undisputed that Redwood has had recent, ongoing
ties to GelStat (*and* Minnesota) from circa August 30, 2006 through September
5, 2007.

20.     That the *GelStat Press Releases* referencing Redwood's ongoing
ties to GelStat (Minnesota) ceased following the commencement of this action.

### USSEC's Sham Website, Sham *Press Releases* And Sham Financial Information.

21.     Sometime prior to September 24, 2006 and continuing, in
furtherance of Defendants' scheme utilizing the means or instrumentalities of
interstate commerce and/or the mails and/or telecommunications wires in
connection with the transactions referenced herein, USSEC and Rivera had an
Internet website constructed, "www.ussec.us."   USSEC's website would
play/plays a substantial factor in Defendants' scheme.

22.     USSEC's website contains deceptive, false and misleading aerial
photographs of USSEC's Natchez, Mississippi riverfront plant purporting to

encompass many acres on which a vast complex of buildings, containment tanks, infrastructure, etc. are pictured; *when in fact*, with the exception of one small building containing only a small USSEC "test facility," the complex is vacant (the City of Natchez became the owner of the riverfront "Port Facility" upon its prior occupants (International Paper, Armstrong Tire, etc.) vacating the same thereby resulting in its closure).

23.     The website also contains deceptive, false and misleading references to USSEC's Natchez "test facility" via a sham December 12, 2006 *Press Release* captioned "U.S. Sustainable Energy Corp. Acquires 35 Acre Industrial Facility as the Cornerstone for Biofuels Revolution" ("*12/12/06 Industrial Facility Acquisition Press Release*") authored by, without limitation, Dalsgaard and/or Rivera; *when in fact*, while touting the "recently appraised [value thereof] at $8.9 million and [that it purportedly] was acquired in an all-cash transaction" for the proposition that USSEC both purchased such property and actually had cash resources to do so (on the one hand), in reality, as evinced by its prospectively audited financial records, USSEC never "acquired" the same nor has ever had sufficient cash resources to do so (on the other).

24.     The website also contains deceptive, false and misleading references to USSEC's so-called "research and development facility in Port Gibson, Mississippi"; *when in fact*, such "facility" is only a small, mostly vacant/seldom occupied, brick building located on the outskirts of such town.

25.    The sham website is also used to promote USSEC's sham *Press Releases* touting wholly illusory "big money" deals which reference sham financial information, "definitive agreements," "joint venture agreements," "memorandums of understanding," merger proposals, reports, "share exchange agreements," "technology licensing and acquisition agreements" and/or other written documents that materially overstate the value of USSEC and/or its principal asset, namely the *Rivera Process*, to mislead investors regarding the actual earnings potential of USSEC and, in turn, induce investors to purchase shares of stock therein and/or engage in transactions therewith.   In reliance thereon, such parties purchased shares of USSEC stock and/or engaged in business transactions therewith as a direct and proximate cause of which such parties suffered damages directly attributable to defendants' representations.

26.    For example, while USSEC's sham website repeatedly touts to investors its relationship with the nearby (across the Mississippi River) City of Vidalia, Louisiana through sham *Press Releases* authored by, without limitation, Dalsgaard and/or Rivera (on the one hand), USSEC omits informing investors of the fact that *no such relationship exists* due to USSEC's refusal to, without limitation, provide requisite financial disclosures, respond to regulatory agency inquiries, etc. (on the other).  *See e.g.* September 24, 2006 *Press Release* ("Fuel From 1 Bushel of Raw Soybeans" ("*9/24/06 PR*")); October 13, 2006 *Press Release* ("U.S. Sustainable Energy Corp. Announces the Construction of the

First United States 100% Green Power Public Utility" ("*10/13/06 PR*")); October 16, 2006 *Press Release* ("U.S. Sustainable Energy Corp. Announces Agreement With I.C. Thomasson Associates, Inc. to Build an Organic Fertilizer and Biofuel Production Facility in Natchez, MS, and a 40 MW Green Power Generation Facility in Vidalia, LA" ("*10/16/06 PR*")); October 25, 2006 *Press Release* (USSEC "Announces Strategic Alliance to Build the World's Largest 1000 Megawatt Green Power Utility Company to Demonstrate Revolutionary Biofuels at Vidalia, LA City Hall at 11:00 am CST on October 31, 2006" ("*10/25/06 PR*")); October 30, 2006 Press Release ("U.S. Sustainable Energy Corp. Announces an International Live Web Broadcast, Demonstration and Validation of Its Blockbuster Technology and Unique Biofuels at City Hall in Vidalia, LA" ("*10/30/06 PR*")); November 7, 2006 *Press Release* ("Wall Street Resources, Inc. Releases an Analytical Profile on USSEC With a 12-Month Target Value of $5.55" ("*11/7/06 PR*")); December 5, 2006 *Press Release* ("USSEC Announces Update on Distribution of SSTP Dividend" ("*12/5/06 PR*")); and December 10, 2006 "Global Validation Presentation Video" ("*12/10/06 Global Validation Video*") filmed in Vidalia, LA.

27.   As corroborated by its City Manager, USSEC has repeatedly rebuked Vidalia's repeated efforts/written requests to USSEC to correct such false and misleading representations by removing all references to Vidalia from USSEC's sham website.

28.     USSEC's sham website, with its sham *Press Releases* and sham financial information, is but one of several facets of Defendants' scheme calculated to promote the sale of USSEC stock to investors and, in turn, induce investors to purchase shares of stock therein and/or engage in transactions therewith.  In reliance thereon, such parties purchased shares of USSEC stock and/or engaged in business transactions therewith as a direct and proximate cause of which such parties suffered damages directly attributable to defendants' representations.

29.     USSEC's sham website, with its sham *Press Releases* and sham financial information is an "interactive" website allowing viewers to directly contact USEEC and/or Redwood and/or exchange information therewith regarding the *Press Releases* and/or financial information referenced therein/promoted thereby.

30.     USSEC's sham website, sham *Press Releases* and sham financial information representing the occurrence of past and/or present events (and/or future events Defendants had no intention of performing) were at all times material to Greenbelt's decisions to engage in prospective business transactions with Defendants.

   **Redwood And Rivera's Involvement In Drafting The Sham Press Releases; The *5/7/07 Cutler* Email Evincing Defendants' Scheme.**

31.     Dalsgaard and/or Rivera *undisputedly* author the sham *Press Releases* materially overstating the value of USSEC and/or the *Rivera Process*,

and misrepresenting USSEC as a promising biofuel technology company possessing exclusive rights thereto with the potential for substantial earnings.

32.     For example, in a May 6, 2007 email from Dalsgaard to Rivera and colleague Kelmer Smith ("Smith"), referring to an attached "Illinois Update" *Press Release* (involving USSEC and Illinois Biofuel Group, LLC (another victim of Defendants' scheme)), Dalsgaard, the drafter thereof, stated:

>  Please return comments to me by 5 pm est today, Sunday.
>
>  I will incorporate those comments immediately and then we can forward to Richard Cutler for final approval.
>
>  Dennis quote came from the Chicago newspaper article, and the financials from [Smith/Rivera].
>
>  Thanks
>  [Dalsgaard]

33.     That in his same day response to the foregoing email, Smith wrote to Rivera and Dalsgaard, stating:

>  Comments in yellow, [Rivera] I don't remember what you changed to get the higher numbers.  The numbers [Smith] showed are 'plenty' high and are easily defensible.
>
>  My recommendation is you should spread these releases out over several days and build up to one that you consider the best news.
>
>  [Smith]

(Emphasis).

34.     That in his May 7, 2007 response to Dalsgaard's email string

-14-

regarding the "Illinois Update" *Press Release*, USSEC's securities lawyer M.

Richard Cutler ("Cutler") took Smith, Rivera and Dalsgaard to task by stating:

> My comments are marked.  In general, I believe <u>this is too</u>
> <u>'forward looking' and would suggest we try to avoid projected</u>
> <u>information as it gets you into trouble unless you are</u>
> <u>**CERTAIN** to obtain those results.</u>

> [Cutler]

("*5/7/07 Cutler Email*").  (Emphasis).

35.     The *5/7/07 Cutler Email* is consistent with the allegations that sham

*Press Releases* are/have been used to inflate the value of USSEC stock ("pump")

and conclusively evinces Redwood (Dalsgaard), USSEC and Rivera's direct

involvement therewith.

**Rivera Contacts ONYI.**

36.     Circa December 2006 and continuing, in need of an ethanol plant to

further Defendants' scheme, Rivera contacted Iowan Taylor Moffitt ("Moffitt"

(ONYI's CEO)), to discuss the purchase of one of Diversified's plants.  As his

pitch, Rivera claimed, *inter alia*, that USSEC was a company "attempting to

replace foreign oil."   Moffitt dismissed USSEC as an unlikely customer,

concluding that USSEC did not appear to be the type of company in the market

for one of Diversified's A500 ethanol plants because the 500,000-gallon capacity

thereof was far too small for a company attempting to replace foreign oil.

37.     Circumventing Moffitt, Rivera, in turn, contacted certain of Moffitt's

colleagues to curry their favor in convincing Moffitt that through USSEC, Rivera was interested in helping Diversified capitalize; to that end, Rivera wanted Moffitt and colleagues to visit USSEC's facility and bring some ethanol for testing. Upon Moffitt's returning Rivera's call, Rivera told Moffitt "USSEC had a revolutionary new technology (i.e. the *Rivera Process*) that would put all fuel companies out of business." Touting his millions of dollars in financial resources, Rivera represented, "that British Petroleum was trying to buy his technology for nine billion dollars." Rivera told Moffitt "USSEC needed small ethanol plants to pair with its small reactors." Thereafter, Diversified supplied two containers of denatured ethanol to USSEC for testing purposes.

38.    Concurrently, Greenbelt, including Moffitt and other colleagues, visited USSEC's website to learn more about USSEC and its business activities. USSEC's website and, in particular, its *Press Releases* (including, without limitation, USSEC's: *9/24/06 PR, 10/13/06 PR, 10/16/06 PR, 10/25/06 PR, 10/30/06 PR, 11/7/06 PR, 12/5/06 PR, 12/10/06 Global Validation Video* and/or *12/12/06 Industrial Facility Acquisition Press Release*) and financial information referenced therein addressing USSEC's past achievements provided *both* a wealth of information regarding USSEC *and*, consistent therewith, confirmed many of Rivera's representations. At all times referenced herein, Greenbelt, including Moffitt and other colleagues, relied upon the veracity of USSEC's website, *Press Releases*, financial information referenced therein and Rivera's

veracity.

39.    USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made) and Rivera's representations and Greenbelt's reliance thereon, were at all times material to Greenbelt's prospective decisions to engage in prospective business transactions with Defendants.  In reliance thereon, Greenbelt engaged in the following described transactions therewith and as a direct and proximate cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

### The Visit To USSEC's Mississippi Facility.

40.    Thereafter, Moffitt and colleague Vint Lewis ("Lewis" (a Minnesota resident)) drove from Iowa to meet with Rivera and visit USSEC's facility in Natchez, Mississippi.  Over breakfast the following morning, Rivera dominated the conversation, preventing Moffitt from ever discussing Diversified's A500 ethanol plants (then or during the remainder of his visit).  Instead, to curry credibility with Moffitt and Lewis, Rivera emphasized his alleged charitable deeds to orphans, battered women, battered children, battered animals and education while concurrently touting his desire to defeat "The Seven Sisters of Big Oil" while helping farmers and creating jobs.  *See also 12/10/06 Global Validation Video.*

41.    Rivera then took Moffitt and Lewis to tour a tire recycling facility, where a large gasification unit was running.  The unit operated "batch/continuous"

-17-

with a steady stream of beans being augered into the front of the machine and, in turn, a steady stream of burnt soybeans coming out of the other end, which Rivera represented was his "$15.00 per pound organic fertilizer."

42.    During his tour, Rivera represented that the U.S. Air Force was running his fuel in their jets because of its low freezing temperature and that he had documentation showing that the U.S. Air Force must, by law, buy electricity from him.  Rivera further represented that his fuel would be burned in turbine generators to produce green electricity that must be purchased by government agencies.

43.    Rivera then provided Moffitt and Lewis a demonstration; running engines and having them touch the engines to demonstrate how cool they were running while claiming, for example, that when Rivera got this million-mile engine, it barely ran.  Rivera also claimed that he/USSEC was hated by the automakers because in the future, when his/USSEC's fuel has replaced big oil, engines will last forever.

44.    Rivera went on to claim that his life was in danger due to such technology and that attempts had been made on his life; hence, his need for having armed guards.

45.    Rivera had additional demonstrations performed utilizing the ethanol samples mixed with his biofuel.  During the same, Rivera went on to tell Moffitt and Lewis, "by selling his organic fertilizer at $15.00 per pound, and getting the

Kyoto Treaty Green Certificates, and the carbon credits, and the ethanol credits, he would be able to give away his biofuel for free and still make money, even if soybeans went up to $20 per bushel."

46.     Rivera claimed that USSEC would put an end to dependence on foreign oil.  That he would be able to pay farmers 10% more for their beans and would be making billions every year from which he would be able to buy-out the competition after they had gone bankrupt and, in turn, dominate the whole industry.

47.     Rivera then had Smith later provide Moffitt and Lewis with a tour of USSEC's Natchez plant during which they were told that everything in sight was owned, "debt-free."

48.     Upon their meeting back up with Rivera, Rivera displayed his rare exotic sports car touted as "a gift from Redwood" while claiming, "Redwood's so glad to have my business that they gave me that and a $150,000 platinum Rolex."  Pointing across the Mississippi River to Vadalia, Louisiana, Rivera told Moffitt and Lewis, "we also own 150 acres of land across the Mississippi for expansion."  *See also 10/25/06 PR.*  While standing on the dock, Rivera said that he hired the best patent law firm in the U.S. with a $100,000 retainer fee and that it was super-excited about his technology now that they have seen it.  Rivera also claimed this was the same firm that patents all of British Petroleum's technology.

-19-

49.     At all times referenced herein, in addition to USSEC's website, *Press Releases* and financial information referenced therein, Greenbelt's Moffitt and Lewis relied upon Rivera's veracity.

50.     USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made) and Rivera's representations and Greenbelt's reliance thereon, were at all times material to Greenbelt's prospective decisions to engage in prospective business transactions with Defendants.  In reliance thereon, Greenbelt engaged in the following described transactions therewith and as a direct and proximate cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

51.     Upon returning to the office, in furtherance of Defendants' scheme, Rivera started asking Moffitt detailed questions about ONYI stock.

**USSEC Decides To "Buy-Out" ONYI.**

52.     Later that day, Moffit and Lewis were driven to Rivera's estate replete with high wooden fences and guard dogs imported from Germany.  During their visit, Rivera stated, "He had less than two years to live, that British Petroleum had offered to pay nine billion dollars for his technology and that he turned them down because he did not want them to snuff out his technology to prolong the foothold of big oil."  Rivera also stated, "Cargill offered to pay him the same nine billion dollars, but he turned them down because they are French and he is too

patriotic and, as a former Marine, wanted to keep this for America."

53.     That evening over dinner, Rivera began telling Moffitt and Lewis how he had taken over Turnkey Electric and other companies.  Dominating the conversation, Rivera again inquired about ONYI stock culminating with his stating, "he wanted to buy-out ONYI, resulting in all ONYI stock being converted into USSEC."  After finishing dinner, Moffitt and Lewis returned to Iowa very pleased with the meeting, concluding that at a minimum, Rivera/USSEC would be purchasing some of Diversified's ethanol plants.

54.     USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made) and Rivera's representations and Greenbelt's reliance thereon, were at all times material to Greenbelt's prospective decisions to engage in prospective business transactions with Defendants.  In reliance thereon, Greenbelt engaged in the following described transactions therewith and as a direct and proximate cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

### USSEC's Plan To Buy-Out ONYI Results In A "Memorandum Of Understanding."

55.     Upon returning to Iowa, Moffitt was surprised to learn that rumors were already circulating that USSEC had taken over ONYI.

56.     The next day, Rivera called Moffitt and said he was going to fly up to

Iowa to inspect ONYI's facilities before he acquired it.

57.     On December 21, 2006, in furtherance of Defendants' scheme, Rivera and colleagues flew to ONYI's headquarters in Iowa (on a charted plane arranged for by Redwood); however, due to inclement weather, they were forced to land in Omaha, Nebraska, and then drove 3 hours in a rental car the rest of the way to ONYI's headquarters.

58.     Upon arriving, Rivera and colleagues met with Moffit and colleagues to discuss a merger of USSEC with ONYI resulting in one "super company." Following a presentation (with representations identical to those previously made to Moffitt and Lewis), Rivera drew a diagram stating, "The 'super company' would be USSEC under which would be Turnkey Electric, Diversified Ethanol, PESCO, Sustainable Power, the fertilizer company, and some other companies totaling seven in number." Rivera said that ONYI would, in turn, end up owning a portion of all of these companies as they grew and that the share price of ONYI stock would skyrocket.

59.     Following the meeting, Rivera and party were provided a tour of ONYI's facility and ethanol plant (which was 95% complete at the time). During the tour Rivera appeared uninterested; instead he continued discussing/inquiring about ONYI's stock. Following the tour, Rivera proposed a merger of the companies while claiming that Diversified was going to build all of USSEC's ethanol plants and, eventually, the largest ethanol plant in the world.

60.     Thereafter, discussions between Moffitt and colleagues ensued regarding the value of the merger, USSEC's technology, how ONYI and Diversified could save money by working with USSEC, and what it would mean to ONYI's shareholders if USSEC provided ONYI with the proposed funding.  The group agreed to move forward.

61.     On December 22, 2006, in furtherance of Defendants' scheme, Dalsgaard contacted Lewis to discuss the status of matters.   Dalsgaard confirmed the same and provided Lewis with his contact information.

62.     On December 22, 2006, the parties met again during which Smith presented a laptop computer containing a pre-prepared "Memorandum Of Understanding" ("MOU") between USSEC and ONYI.  Following some updates, Rivera and Moffitt signed the document.

63.     The MOU provided, *inter alia*, that its "purpose" was to continue to develop and expand a framework of cooperation between USSEC and ONYI. That ONYI would acquire certain assets of USSEC in an acquisition through stock for asset swap and that the surviving company would be a single entity specializing in the production of organic fertilizer, carbon, liquid and gaseous biofuels, ethanol and green power.  In reality, Rivera/USSEC's obtaining the MOU was a critical step in furtherance of Defendants' scheme and, thereby, allowed Defendants to obtain confidential, financial and/or otherwise proprietary information regarding ONYI.

-23-

64.    The MOU also contained a "statement of mutual benefit and interests" the next effect of which was that the original ONYI shareholders would own 10% of the new company and the original USSEC shareholders would own 90% of the new company.  USSEC would be the parent holding company of multiple wholly subsidiaries that would be spun off into separate public companies at a later date.

65.    After signing the MOU, Rivera instructed Moffitt to check in with Rivera and Smith every morning.  Rivera also told Moffitt that Smith would act as liaison and that Moffit would be given a USSEC email address with which to communicate.  Rivera also stated that he would be sending his accountant to Iowa to obtain ONYI's financial records. Before leaving, Rivera pointed at a small working model of an ethanol "still" and said, "I want that.  Send it down to me for my Christmas present."  Another was ordered and sent to him within the week.

66.   USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made) and Rivera's representations/Dalsgaard's confirmation thereof, and Greenbelt's reliance thereon, were at all times material to Greenbelt's decision to execute the December 22, 2006 MOU and Greenbelt's decisions to engage in further business transactions with Defendants.  In reliance thereon, Greenbelt engaged in the following described transactions therewith and as a direct and proximate

-24-

cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

**USSEC'S "Financial Results Summary."**

67.    On December 28, 2006, in furtherance of Defendants' scheme, Rivera sent Lewis a spreadsheet that Rivera had prepared which included a "Financial Results Summary" representing millions of dollars of profits that would be made.

68.    USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made), MOU, Financial Results Summary and Rivera's representations/Dalsgaard's confirmation thereof, and Greenbelt's reliance thereon, were at all times material to Greenbelt's decisions to engage in further business transactions with Defendants.   In reliance thereon, Greenbelt engaged in the following described transactions therewith and as a direct and proximate cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

**The MOU And Financial Results Summary Result In Sham Press Releases.**

69.    On January 4, 2007, in furtherance of Defendants' scheme, Dalsgaard circulated a draft of a Press Release ("*1/4/07 PR*") to Lewis and Rivera stating, "Diversified Ethanol A Division of Originally New York, Inc. Closing In On

-25-

$12 Billion Acquisition To Become Market Leader In Ethanol Production –

Combined Companies To Produce Ethanol At 60% Discounts To Any Other

Technology In The World."   The Release went on to state, "We believe *this

technology has an immediate market value of between 9 and 12 billion dollars.

In* light of these facts, *if our combined companies were to eventually have a

billion shares outstanding, the intrinsic value of our company stock would be $12

per share*, other growth catalysts not considered."  (Emphasis).

     70.    On January 5, 2007, in furtherance of Defendants' scheme,

Dalsgaard also circulated a draft of a Press Release ("*1/5//07 PR*") to Lewis and

Rivera to be issued by USSEC entitled "U.S. Sustainable Energy Corp. And

Diversified Ethanol, Inc. Sign Memorandum Of Understanding To Join Forces To

Enter Multi Billion Dollar Ethanol Market."   The *1/5/07 PR* identified Redwood as

the "Investor Contact."

     71.    USSEC's website, *Press Releases*, financial information

representing the occurrence of past and/or present events (and/or future events it

had no intention of performing when made), MOU, Financial Results Summary,

*1/4/07 PR, 1/5/07 PR* and Rivera's representations/Dalsgaard's confirmation

thereof, and Greenbelt's reliance thereon, were at all times material to

Greenbelt's decisions to engage in further business transactions with

Defendants.  In reliance thereon, Greenbelt engaged in the following described

transactions therewith and as a direct and proximate cause of which Greenbelt

suffered damages directly attributable to Defendants' actions.

**ONYI Changes Its Name To United Ethanol Group, Inc.**

72.     On February 2, 2007, in furtherance of Defendants' scheme and at Rivera/USSEC's insistence, ONYI, the parent company of Diversified announced that it was changing its name to United Ethanol Group, Inc. ("United Ethanol"). Concurrently, consistent with the MOU, ONYI/United Ethanol named Rivera Chairman of the Board of Directors.   In reality, Rivera/USSEC's insisting that ONYI change its name to United Ethanol was a critical additional step in furtherance of Defendants' scheme.

73.     USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made), MOU, Financial Results Summary, *1/4/07 PR, 1/5/07 PR* and Rivera's representations/Dalsgaard's confirmation thereof, and Greenbelt's reliance thereon, were at all times material to ONYI's decision to change its name to United Ethanol/agreeing to name Rivera Chairman of the Board and Greenbelt's decisions to engage in further business transactions with Defendants.   In reliance thereon, Greenbelt engaged in the following described transactions therewith and as a direct and proximate cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

**United Ethanol And USSEC Sign A "Definitive Agreement."**

74.     On February 27 and March 2, 2007, respectively, following ONYI's

changing its name to United Ethanol and Rivera's being appointed as Chairman and in furtherance of Defendants' scheme, United Ethanol and USSEC signed a "Technology Licensing And Acquisition Agreement" ("Definitive Agreement" (with an effective date of February 21, 2007)).  The Definitive Agreement detailed, *inter alia*, the conditions needed to move towards completing the previously announced MOU outlining the planned merger and corporate restructure under the terms of which, USSEC would be merged into ONYI and become a full reporting company trading on the bulletin boards; the surviving entity to be renamed USSEC.  In reality, Rivera/USSEC's obtaining the Definitive Agreement was a critical additional step in furtherance of Defendants' scheme and, thereby, allowed Defendants to exercise *de facto* control over ONYI.

75.   USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made), MOU, Financial Results Summary, *1/4/07 PR, 1/5/07 PR*, decision to change ONYI's name to United Ethanol/agreeing to name Rivera Chairman of the Board, and Rivera's representations/Dalsgaard's confirmation thereof, and  Greenbelt's reliance thereon, were at all times material to United Ethanol's (ONYI's) decision to enter into the February 21, 2007 Definitive Agreement and Greenbelt's decisions to engage in further business transactions with Defendants.   In reliance thereon, Greenbelt engaged in the following described transactions therewith and as a

-28-

direct and proximate cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

76.     From circa December 2006 through March 2007 and continuing, Defendants utilized the means or instrumentalities of interstate commerce and/or the mails and/or telecommunications wires in connection with their inducing Greenbelt's participation in the foregoing transactions by repeatedly, without limitation, emailing, faxing and/or mailing documents material thereto to, without limitation, Greenbelt, Moffitt and/or Lewis who were located in Iowa and/or Minnesota.

### Rivera/USSEC Have Diversified's Ethanol Plant Moved From Iowa To Mississippi.

77.     Following execution of the Definitive Agreement, at the insistence of now Chairman Rivera, Rivera had USSEC personnel travel from Mississippi to Iowa following which Diversified's $800,000.00 A70 ethanol plant was disassembled and moved from its Iowa location to USSEC's facility in Mississippi.

78.     USSEC's website, *Press Releases*, financial information representing the occurrence of past and/or present events (and/or future events it had no intention of performing when made), MOU, Financial Results Summary, *1/4/07 PR, 1/5/07 PR*, decision to change ONYI's name to United Ethanol/agreeing to name Rivera Chairman of the Board, United Ethanol's

-29-

decision to enter into the Definitive Agreement and Rivera's representations, and ONYI's reliance thereon, were at all times material to Diversified's decision to have its $800,000.00 A70 ethanol plant moved from Iowa to Mississippi. In reliance thereon, ONYI (Greenbelt) engaged in the following described transactions therewith and as a direct and proximate cause of which Greenbelt suffered damages directly attributable to Defendants' actions.

### With Diversified's Ethanol Plant Now In Mississippi, USSEC Terminates The Definitive Agreement.

79.   On March 29, 2007, in furtherance of Defendants' scheme and after having absconded with Diversified's ethanol plant to Mississippi, USSEC had Cutler notify ONYI that the Definitive Agreement was "terminated *ab initio*" (i.e. from its inception).

### Rivera And Smith "Resign" From ONYI.

80.   On March 29, 2007, in furtherance of Defendants' scheme and concurrent with its termination of the Definitive Agreement, Rivera resigned as Chairman of ONYI's Board and Smith resigned as a Director of ONYI.

### USSEC Rebukes ONYI's Attempts To Obtain The Return Of ONYI's Property.

81.   On April 12, 2007, ONYI had its attorney send a letter to USSEC demanding that it return all of ONYI's property, including, without limitation, its A70 ethanol plant (now located in Mississippi (or pay ONYI $800,000 for it), ONYI's corporate and financial records, etc.  USSEC refused to do so.

-30-

**The SEC Investigates "USSEC."**

82.     On July 2, 2007, the U.S. Securities and Exchange Commission ("Commission"), pursuant to Litigation Release Number 20182, filed an application with the United States District Court for the Northern District of Georgia for an order to enforce investigative subpoenas served on a privately held corporation located in Seffner, Florida also named U.S. Sustainable Energy Corporation ("USSEC-FL") and its President John Stanton ("Stanton") a resident of Tampa, Florida.  The Commission's application and supporting papers allege that USSEC-FL and Stanton have failed to comply with validly issued and served subpoenas for documents relating to the Commission's investigation. Importantly, the Commission's investigation "involves, but is not limited to, *a separate but related corporation known as [USSEC], which is headquartered in Mississippi . . .*"  (Emphasis).

**Rivera Has USSEC's Smith Arrested.**

83.     Sometime thereafter, in furtherance of Defendants' scheme, based upon fabricated allegations of wrongdoing, Rivera had Smith arrested for purportedly "embezzling" trade secrets.   Smith was later released and Rivera's charges dismissed.

**Rivera Has USSEC's Accountant Arrested.**

84.     Sometime thereafter, in furtherance of Defendants' scheme, based upon fabricated allegations of wrongdoing, Rivera also had USSEC's longtime

certified public account Lisa Kerr arrested for purportedly "impersonating a certified public accountant."  Upon belief, Kerr was later released and Rivera's charges dismissed.

### The Consequences of Defendants' Scheme.

85.   As a direct and proximate result of Defendants' scheme, ONYI (Greenbelt) has, without limitation, been left deeply in debt, was forced to "de-list" from the over-the-counter ("OTC") stock market (and, thereby, relegated to the pink sheets), has incurred substantial diminution in the value of its stock and has had its property illegally converted.

### Greenbelt Commences Suit.

86.   On September 27, 2007, Greenbelt filed this action against Redwood, USSEC and Rivera alleging claims for conversion of property, unjust enrichment, intentional misrepresentation, civil conspiracy, violation of 18 U.S.C. § 1962(c) (Racketeer Influenced and Corrupt Organizations Act ("Civil RICO")), and Civil RICO Conspiracy.  Greenbelt seeks aggregate damages in excess of a million dollars.  *See* ECF Doc. 1 (Complaint).

### Rivera Sues Greenbelt, Iowa Resident Moffitt And Minnesota Resident Lewis.

87.   Rather than assert counter-claims to the allegations set forth herein, on October 17, 2007, Rivera surreptitiously filed a state court action against Greenbelt, Iowa resident Moffitt and Minnesota resident Lewis in the Circuit Court

of Adams County, Mississippi.  *See John H. Rivera, Individually and as CEO of U.S. Sustainable Energy Corporation v. Originally New York, Inc. n/k/a Greenbelt Resources Corporation, et al.*, Adams County Circuit Court File Number 07-KV-0147-J.  This civil action involves claims (in fact, counterclaims) by Rivera arising directly from Greenbelt's claims asserted against Rivera in this action.  Indeed, expressly alleges "intentional and fraudulent misrepresentation, breach of agreement, intentionally conspiring to inflict damages on the reputation of the corporation [USSEC], intentionally causing the shares of [USSEC], to immediately reduce in value *by filing a frivolous suit against [Rivera] in a Minnesota Court . . .*"  (Emphasis).

88.    On November 27, 2007, Greenbelt, Moffitt and Lewis removed Rivera's state court action.  *See John H. Rivera, Individually and as CEO of U.S. Sustainable Energy Corporation v. Originally New York, Inc. n/k/a Greenbelt Resources Corporation, et al.*, Court File Number 5:07-CV-213 DCB-JMR (S.D. Miss.).

89.    On November 30, 2007, Greenbelt, Moffitt and Lewis moved to dismiss or, alternatively, transfer Rivera's action to Minnesota based upon the "first to file rule."

90.    On February 19, 2008, the Court (The Honorable David C. Bramlette) issued an Order finding that Rivera's claims arise out of the same transactions and occurrences as those in this action *and* that "the 'first to file' rule is

applicable. The Court, therefore, ordered the parties to brief two (2) specific issues: (1) whether dismissal is proper; and (2) alternatively, to address the factors relevant to a transfer of venue analysis. The matter is now under the Court's consideration. Greenbelt's amended claims follow:

## COUNT ONE

## CONVERSION OF PROPERTY

91. Greenbelt restates and realleges the foregoing paragraphs 1-90 as against USSEC and Rivera as though fully set forth herein.

92. ONYI has at all times maintained and asserted a property interest in its property including, without limitation, its $800,000.00 A70 ethanol plant, ONYI's corporate and financial records, etc.

93. That prior to and/or following USSEC's termination of the Definitive Agreement *ab initio* (i.e. from its inception), certain of Greenbelt's property (including, without limitation, its $800,000.00 A70 ethanol plant, ONYI's corporate and financial records, etc.) was taken by USSEC and Rivera.

94. Following USSEC's termination of the Definitive Agreement *ab initio* (i.e. from its inception), ONYI duly demanded the return of its property and/or payment for its $800,000.00 A70 ethanol plant. USSEC refused to do so.

95. Following USSEC's taking of ONYI's property, USSEC and Rivera failed to return and/or pay for the same and, instead, have converted the same for USSEC and/or Rivera's own use.

-34-

96.    USSEC and/or Rivera's retention of ONYI's property without returning and/or paying for the same has proximately caused Greenbelt damages in an amount in excess of $800,000.00 and, additionally, requires USSEC and/or Rivera to provide a detailed accounting thereof.

## COUNT TWO

### UNJUST ENRICHMENT

97.    Greenbelt restates and realleges the foregoing paragraphs 1-96 as against USSEC and Rivera as though fully set forth herein.

98.    USSEC and Rivera have received property from ONYI with the expectation and understanding that USSEC would pay for such property. However, USSEC has failed and refuses to pay for the same.

99.    As a result, USSEC and/or Rivera have been unjustly enriched in an amount in excess of $800,000.00.

## COUNT THREE

### INTENTIONAL MISREPRESENTATION

100.    Greenbelt restates and realleges the foregoing paragraphs 1-99 as against all Defendants as though fully set forth herein.

101.    As described in paragraphs 21-90, Defendants made numerous representations to ONYI through: USSEC's sham website; Rivera and/or Dalsgaard's sham Press Releases (*9/24/06 PR, 10/13/06 PR, 10/16/06 PR, 10/25/06 PR, 10/30/06 PR, 11/7/06 PR, 12/5/06 PR, 12/10/06 Global Validation*

-35-

*Video, 12/12/06 Industrial Facility Acquisition Press Release*); sham financial information representing the occurrence of past and/or present events (and/or future events Defendants had no intention of performing when made); a sham MOU; a sham Financial Results Summary representing that millions of dollars of profits that would be made; a sham *1/4/07 PR*; a sham *1/5/07 PR*; Rivera's repeated statements that "British Petroleum had offered to pay nine billion dollars for [Rivera's] technology, and that [he had] turned them down because he did not want them to snuff out his technology to prolong the foothold of big oil"; Rivera and Dalsgaard's representations that by combining the resources of ONYI and USSEC in the context of the "$12 Billion Acquisition To Become Market Leader In Ethanol Production . . . *the intrinsic value of [the] company stock would be $12 per share*, other growth catalysts not considered"; and a sham Definitive Agreement (the terms of which Defendants had no intention of performing when made).

102.    Defendants' representations regarding the foregoing and conduct consistent therewith were all material to ONYI's (Greenbelt's) decisions to engage in transactions with Defendants and such representations were susceptible of knowledge.

103.    Defendants' representations and conduct consistent therewith were at all times material to ONYI's (Greenbelt's) decisions to engage in transactions with Defendants, enter into the MOU, the Definitive Agreement and/or allow its

property to be provided to USSEC.

104.   At the time of making such representations, Defendants knew that the same were false (and/or as to future events, that Defendants had no intention of performing when made).

105.   At the time of making such representations Defendants intended to induce ONYI (Greenbelt) to act on such representations and, in reliance thereon, ONYI (Greenbelt) did in fact act by engaging in business transactions with Defendants, entering into the MOU, the Definitive Agreement and/or allowing its property to be provided to USSEC.

106.   With such knowledge, Defendants intended that their representations would be relied upon by ONYI (Greenbelt).  Defendants intended to benefit from ONYI's reliance by obtaining, *inter alia*, certain of ONYI's property (including, without limitation, its $800,000.00 A70 ethanol plant) and corporate and financial records, etc.

107.   In reliance thereon, to its detriment and lacking knowledge of Defendants' true intentions, ONYI (Greenbelt) relied upon Defendants' representations and engaged in business transactions with Defendants, entered into the MOU, the Definitive Agreement and/or allowed its property to be provided to USSEC.  Shortly thereafter, with ONYI's property in their possession, Defendants terminated the Definitive Agreement *ab initio* (i.e. from its inception) concurrent with Rivera and Smith resigning from ONYI.

108.   Defendants' misrepresentations have proximately caused Greenbelt damages in an amount in excess of $800,000.00 regarding its property.

109.   Defendants' misrepresentations have proximately caused substantial diminution in the value of Greenbelt's stock resulting in damages in an amount in excess of $75,000.00.

## COUNT FOUR

### CIVIL CONSPIRACY

110.   Greenbelt restates and realleges the foregoing paragraphs 1-109 as against all Defendants as though fully set forth herein.

111.   Beginning circa December 2006 and continuing, Defendants willfully and unlawfully conspired, combined and agreed with each other to commit certain tortious acts.   Specifically, Defendants each knowingly, willfully and unlawfully agreed to  make  and  did  make  fraudulent  misrepresentations concerning the nature of their transactions with ONYI.

### Object And Means Of The Conspiracy

112.   It was the object of the aforementioned conspiracy that Defendants would and did defraud ONYI to inflate the value of its stock and/or obtain certain of ONYI's property (including, without limitation, its $800,000.00 A70 ethanol plant) and corporate and financial records, etc. by means of false and fraudulent pretenses, representations and promises.

113.   In furtherance of the aforementioned conspiracy, without limitation,

-38-

the following manner and means were accomplished:

    (a)   Defendants did agree, together and with each other, that they provide complimentary/reciprocal verbal misrepresentations to ONYI calculated to curry credibility with ONYI for the purpose of its engaging in prospective business activities with Defendants.

    (b)   Defendants did agree, together and with each other, that they would thereafter supplement such verbal misrepresentations with sham spreadsheets and/or press releases to bolster the veracity thereof and, in turn, curry credibility with ONYI to that it would enter into the MOU, the Definitive Agreement and/or otherwise provide ONYI's property to Defendants.

### Overt Acts

114.  To execute, accomplish and carry out the aforementioned conspiracy, Defendants performed, without limitation, the following overt acts:

    (a)   Utilizing USSEC's sham website, Defendants issued and/or reiterated past sham Press Releases (*9/24/06 PR, 10/13/06 PR, 10/16/06 PR, 10/25/06 PR, 10/30/06 PR, 11/7/06 PR, 12/5/06 PR, 12/10/06 Global Validation Video, 12/12/06 Industrial Facility Acquisition Press Release*), containing sham financial information representing the occurrence of past and/or present events (and/or future events Defendants had no intention of performing when made).

    (b)   Defendants prepared a sham MOU.

    (c)   Defendants prepared sham spreadsheets containing a sham Financial Results Summary representing that millions of dollars of profits that would be made.

    (d)   Defendants prepared a sham *1/4/07 PR.*

    (e)   Defendants prepared a sham *1/5/07 PR*.

-39-

(f)     Rivera repeatedly stated "British Petroleum had offered to pay nine billion dollars for [Rivera's] technology, and that [he had] turned them down because he did not want them to snuff out his technology to prolong the foothold of big oil."

(g)     Rivera and Dalsgaard represented and issued sham *Press Releases* representing that by combining the resources of ONYI and USSEC in the context of the "$12 Billion Acquisition To Become Market Leader In Ethanol Production . . . *the intrinsic value of [the] company stock would be $12 per share*, other growth catalysts not considered."

(h)     Defendants prepared a sham Definitive Agreement (the terms of which Defendants had no intention of performing when made) that was later terminated *ab initio* (i.e. from its inception) following Defendants acquiring ONYI's property.

115.   As a proximate result of the aforementioned conspiracy, Greenbelt has been damaged in an amount in excess of $75,000.00.

## JURY DEMAND

Greenbelt respectfully demands trial by jury of all claims and issues so triable as allowed pursuant to applicable law.

WHEREFORE, plaintiff Greenbelt Resources Corporation prays for judgment against defendants as follows:

1.     As to Count One of Greenbelt's Amended Complaint (Conversion of Property), a money judgment against USSEC and Rivera for damages in an amount in excess of eight hundred thousand ($800,000.00) dollars;

2.     As to Count Two of Greenbelt's Amended Complaint (Unjust Enrichment), a money judgment against USSEC and Rivera for damages in an

amount in excess of eight hundred thousand ($800,000.00) dollars;

3.      As to Count Three of Greenbelt's Amended Complaint (Intentional Misrepresentation), a money judgment against Defendants for damages in an amount in excess of eight hundred and seventy-five thousand ($875,000.00) dollars;

4.      As to Count Four of Greenbelt's Amended Complaint (Civil Conspiracy), a money judgment against Defendants for damages in an amount in excess of seventy-five thousand ($75,000.00) dollars;

5.      Greenbelt's costs, disbursements, reasonable attorney fees and prejudgment interest; and

6.      For such other and further relief as this court may deem just and equitable including, without limitation, injunctive relief as may be allowed, officer and director bars against Rivera, and disgorgement against Rivera.

GARDNER LAW OFFICE

Dated: April 21, 2008          *s/ Robert M. Gardner*_____
Robert M. Gardner, #234977
P.O. Box 22071
St. Paul, MN 55122-0071
(651) 681-8339

Attorney for Plaintiff
Greenbelt Resources Corporation